**SO ORDERED.**

**SIGNED this 02 day of December, 2008.**



_____
JANICE MILLER KARLIN
UNITED STATES BANKRUPTCY JUDGE

_____

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| In re: )<br>)<br>SHANNON RILEY MILLER and )<br>ANASTASIA CHRISTINE MILLER, )<br>)<br>Debtors. )<br>_____) | Case No. 08-40935<br>Chapter 13 |

### MEMORANDUM ORDER AND OPINION DENYING CONFIRMATION, BUT ALSO DENYING OBJECTION OF FORD MOTOR CREDIT COMPANY REGARDING NEGATIVE EQUITY, GAP INSURANCE, SERVICE CONTRACT AND ADMINISTRATIVE FEE

This matter is before the Court on Creditor Ford Motor Credit Company, LLC's Objection to Confirmation of Debtors' Plan.[1] Ford Motor Credit Company, LLC ("FMCC") has objected to the Chapter 13 plan on the basis that it fails to pay the full amount of FMCC's

---

[1]Doc. 26.

secured claim pursuant to the hanging paragraph in 11 U.S.C. § 1325.[2] The issue in this case is whether the negative equity in Debtors' trade-in, the service contract, the GAP insurance policy, and certain administrative fees that were included in the financing of the new vehicle by FMCC should be considered part of FMCC's purchase money security interest.

The parties waived the opportunity to present evidence at trial in favor of filing a Joint Stipulation of Facts,[3] which the Court adopts. The Court has jurisdiction to decide this matter,[4] and it is a core proceeding.[5]

## I. FINDINGS OF FACT

On April 10, 2007, Debtors purchased a 2007 Ford Fusion and entered into a retail installment contract with FMCC to finance the purchase. The cash price for the vehicle was $19,700.00, with license, title and registration fees of $5.00, taxes of $597.86, administrative fees of $249.95, a service contract for $1,075.00, and a GAP insurance policy for $595.00. In addition to financing those costs, FMCC loaned $5,668.18 so that Debtors could pay off the amount still owed on the vehicle they were trading in. This resulted in a total loan of $27,890.99.

---

[2]This case was filed after October 17, 2005, when most provisions of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (BAPCPA) became effective. All future statutory references are thus to BAPCPA 11 U.S.C. §§ 101 - 1532 (2005), unless otherwise specifically noted.

[3]Doc. 36.

[4]28 U.S.C. § 1334.

[5]28 U.S.C. § 157(b)(2)(L).

2

A little over two years later, on July 9, 2008, Debtors filed their Chapter 13 petition. On that date, Debtors still owed $23,684.99 on the FMCC note.[6] Debtors' Chapter 13 Plan (and amended plan) provided that "[t]his is a 'negative equity' loan with $18,668 paid off on a vehicle traded-in. Claim to be paid $15,900 as secured and balance as unsecured claim."

FMCC objected to Debtors' amended plan, claiming that because the vehicle was purchased within 910 days of filing, Debtors were required to pay the full contract balance pursuant to the hanging paragraph in § 1325(a).[7] Although not specifically raised in the plan or FMCC's objection, the parties' stipulation of facts and their briefs indicate that in addition to the negative equity financed by FMCC, Debtors also now contest that the service contract, the GAP policy, and the administrative fees are part of FMCC's purchase money claim. Conversely, FMCC contends those items should be considered part of its purchase money security interest, subject to the protections contained the hanging paragraph at the end of § 1325(a).

## II. ANALYSIS

Before the enactment of the BAPCPA, secured creditors' claims could be bifurcated into secured and unsecured portions, based on the value of the collateral securing the debt. The accepted vernacular for such bifurcated claims was that the claim was "crammed-down" to the value of the collateral, and the secured value was the amount required to be paid over

---

[6]Although the bar date was November 12, 2008, it appears FMCC failed to file a Proof of Claim. Accordingly, these numbers are strictly from the parties' stipulations.

[7]Although FMCC does not specifically claim that the vehicle was for Debtors' personal use, which is also a requirement for the applicability of the hanging paragraph, Debtors have not contested this element of FMCC's 910 car loan claim.

3

the life of the Chapter 13 plan, with interest at the rate mandated by the Supreme Court's decision in *Till. v. SCS Credit Corp.*[8]

BAPCPA opted to provide more favorable treatment to creditors who loaned money for a debtor to purchase a motor vehicle, for personal use, within 910 days preceding the filing date. It did so by inserting an unnumbered paragraph at the end of 11 U.S.C. § 1325(a)(9), which most courts call the "hanging paragraph." The hanging paragraph, which is sometimes cited as § 1325(a)(*) in judicial opinions, states, in pertinent part, as follows:

> For purposes of paragraph (5), section 506 shall not apply to a claim described in that paragraph if the creditor has a **purchase money security interest** securing the debt that is the subject of the claim, the debt was incurred within the 910-day [sic] preceding the date of the filing of the petition, and the collateral for that debt consists of a motor vehicle (as defined in Section 30102 of title 49) acquired for the personal use of the debtor...."[9]

Subsection 506(a)(1) is the applicable subsection of § 506, and it provides that "[a]n allowed claim of a creditor secured by a lien on property in which the estate has an interest . . . is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property . . . ."

Accordingly, the language contained within the hanging paragraph makes the value of the collateral irrelevant in determining the allowed amount of a claim secured by a purchase money security interest ("PMSI") in a vehicle acquired for the personal use of the debtor within 910 days of the bankruptcy filing. And unless the amount of the claim is

---

[8] 541 U.S. 465, 484-85 (2004) (adopting formula approach, requiring adjustment of prime national interest rate based on risk of nonpayment).

[9] Emphasis added.

4

subject to reduction for reasons other than collateral value, the creditor's allowed secured claim is fixed at the amount of the underlying debt under nonbankruptcy law.  For secured claims that are not within the confines of the hanging paragraph, § 506(a)(1) still governs, and Chapter 13 plans can cram down those secured claims to the value of the collateral.

As a result, this Court cannot confirm a plan that attempts to cram down the claim of a creditor that extended credit to a debtor for the purpose of purchasing a vehicle for a debtor's personal use when that purchase occurred within two and one-half years of the date of filing.  Here, Debtors argue they are not cramming down that part of FMCC's claim that is represented by the purchase price of the vehicle purchased within 910 days.  Instead, they claim they are only cramming  down the portions of FMCC's claim that are non-purchase money, i.e., which were based upon paying off the remaining debt on Debtors' trade-in vehicle, and purchasing a service contract, GAP insurance and for administrative fees. Conversely, FMCC argues that the entire amount it loaned constitutes a purchase money obligation, that the Code permits no portion of its claim to be crammed down, and because the plan does so, it cannot be confirmed.

FMCC's legal argument on these issues is cursory, at best, relying exclusively on *In re Gibson*[10] for the proposition that these additional charges constitute part of the purchase money, as that phrase is used in the Uniform Commercial Code.  *Gibson*, which was decided 27 years ago, and long before the issue was statutorily settled in 2001, dealt with the issue

---

[10] 16 B.R. 257 (Bankr. D. Kan. 1981).

5

of whether a purported purchase money security interest lost that status when non-purchase money obligations were added to the underlying note. Judge Pusateri correctly held that the creditor's claim was not transformed into a non-purchase money interest as a result of non-purchase money amounts, but that the creditor's claim could attain a dual status, where a portion of the security interest held purchase money status, and the remainder was considered non-purchase money. This Court has recently confirmed the application of the dual status rule, rather than the transformation rule, in Kansas in *In re Vega*.[11]

The Court disagrees with FMCC's claim that "it is clear and straightforward that Kansas law includes the objected to items as being included in the definition of 'purchase money'" or that the "United States Bankruptcy Court for the District of Kansas, in the *Gibson* case has so ruled." *Gibson* did not involve a determination of whether the specific items at issue in this case had a sufficiently close nexus to the purchase of the vehicle to be considered purchase money obligations. *Gibson* dealt with the issue of the effect unrelated charges would have on the purchase money obligation. *Gibson* is clearly distinguishable and of little use in deciding the issues before this Court. Instead, because there is no Kansas case law determining whether the disputed items constitute purchase money, the Court will rely on the rapidly growing and very recent body of law from around the country that deals

---

[11]344 B.R. 616, 623 n.29 (Bankr. D. Kan. 2006) (noting that because the Kansas legislature statutorily rejected certain parts of Article 9 adopted by the National Conference of Commissioners on Uniform State Laws (NCCUSL) in amending K.S.A. 84-9-103 in 2001, a "creditor's purchase money status is not lost merely because of a refinancing or infusion of new proceeds. Thus a security interest in goods is a PMSI to the extent that the goods are purchase-money collateral, and non-PMSI as to the remainder.").

6

directly with the issue before the Court, none of which FMCC chose to cite, or attempt to distinguish.

This Court recently addressed the issue of whether the payoff of negative equity, rolled into the financing of the cash price of an automobile, constitutes purchase money, in *In re Padgett*.[12] Although *Padgett* dealt only with one of the specific issues that is present in this case—the inclusion of negative equity in a purchase money obligation—the Court's reasoning and analysis is equally applicable to other types of obligations, as well, including GAP coverage, service contracts and administrative fees. The Court adopts its analysis from *In re Padgett* in this opinion, and will not reiterate it here.

### A. Negative Equity

The Court has held on two separate occasions that the money loaned to repay the note on the borrower's trade-in vehicle is not a purchase money obligation, but merely payment of an antecedent debt. Therefore, that portion of the lender's claim is not subject to the protections of § 1325(a)(*)[13] and may be crammed down. The Court reaffirms its holding in *In re Padgett,* that "the negative equity payoff obligation is not necessary to the transaction, is not of the same type or magnitude as the other items listed in Official

---

[12] 389 B.R. 203 (Bankr. D. Kan. 2008).

[13] *In re Padgett*, 389 B.R. 203 and *In re Vega*, 344 B.R. 616 (Bankr. D. Kan. 2006).

Comment 3, and there is an insufficiently close nexus between retiring the antecedent debt on the trade-in vehicle and acquiring a new vehicle to constitute purchase money."[14]

Although this issue is currently on appeal to the Tenth Circuit Court of Appeals, there is no binding precedent to the contrary on this issue, and FMCC has presented no persuasive arguments to cause the Court to reach a different conclusion. Therefore, the Court finds that the portion of FMCC's claim that arises out of the negative equity of the vehicle Debtors traded in does not constitute a purchase money interest, and is not entitled to the protections afforded under § 1325(*) (the hanging paragraph).

**B.    GAP Agreement**

This Court has not yet addressed whether GAP insurance is properly included in a purchase money security interest. GAP coverage is intended to retire any deficiency that might exist if a borrower damages his vehicle, and his liability insurance coverage is insufficient to cover the amount remaining due on the note (which will often be the case when the loan contains negative equity). In other words, if the vehicle is destroyed, the GAP coverage eliminates the debt so the borrower is not personally liable for the remaining note balance. According to Debtors' brief, the GAP Agreement expressly provides that it is

---

[14]*See, e.g., In re Sanders*, 377 B.R. 836, 853-55 (Bankr. W.D. Tex. 2007) (finding that the creditor's argument that the debtor would not have been able to buy the car unless the lender had taken the upside-down vehicle in trade and paid off the negative equity, thus enabling the debtor to "acquire rights in the collateral" proves too much. "By this logic, were the dealer prepared to pay off some of the debtor's credit card debt to help the debtor qualify for the car loan, that too, following [creditor's] logic, would be 'value given to enable the debtor to acquire rights in the vehicle,' as the debtor could be said not to be able to obtain the financing necessary to buy the vehicle unless other debt was first paid down. One needs only a few imaginative moments to think of other examples so far afield that even [creditor] would have to eventually admit that the formulation would effectively drain "purchase money" of any valid meaning.") (emphasis added).

8

optional, it has no bearing on the extension of credit, the terms of the credit, nor the terms of the sale of the vehicle, and that it can be cancelled at any time prior to a total loss on the vehicle.[15]

The Court finds the analysis in *GMAC v. Horne*[16] persuasive on this issue and adopts that Court's reasoning, as follows:

> Neither GAP insurance nor disability insurance can be fit within the plain, accepted meaning of the price paid for (or asked for) the collateral. Nor does Official Comment 3 support such a construction. However, both are obligations for expenses that, in a general way, were incurred in connection with acquiring rights in the collateral. And, both are part of the overall transaction by which the vehicle was purchased. However, neither is inextricably intertwined with the "value given to enable" in the same way that negative equity financing is intertwined. Indeed, nothing in the record suggests that those obligations enabled the debtor to acquire rights in, or the use of, the collateral. Instead, those obligations are attached to components of the sale price that are quite unrelated to the acquisition of the collateral. Therefore, the obligations for such expenses do not possess the requisite close nexus with the collateral and thus cannot qualify as value given to enable.[17]

---

[15]Neither party submitted a copy of the GAP policy to the Court, and the stipulations do not address Debtors' contentions about the general nature of the coverage. However, when FMCC filed its 2-page response to Debtors' brief, it did not dispute that Debtors had properly quoted from the policy. The Court will accept the statements as accurate, but will allow FMCC 10 days from the date of this order to submit a motion for reconsideration if this, or substantially similar language, is not contained in the GAP policy.

[16]*GMAC v. Horne,* 390 B.R. 191, 205-206 (E.D. Va. 2008). *See also In re Mancini*, 390 B.R. 796, 805-806 (Bankr. M.D. Pa. 2008) (holding that GAP insurance is not the type of charge that should be considered a part of the purchase money security interest); *Wells Fargo Fin. North Carolina 1, Inc. v. Price*, 2007 WL 5297071, *3 (E.D.N.C. 2007) (holding that GAP insurance is not part of a purchase money obligation); *In re Honcoop*, 377 B.R. 719, 723 (Bankr. M.D. Fla. 2007); and *In re White*, 352 B.R. 633, 639 (Bankr. E.D. La. 2006). *But see In re Macon*, 376 B.R. 778, 782-83 (Bankr. D.S.C. 2007) (finding there was a sufficient nexus between GAP insurance and the purchase of the vehicle to bring the GAP insurance within the confines of a purchase money security interest).

[17]*GMAC v. Horne*, 390 B.R. at 205-206.

This Court similarly holds that the funds that FMCC advanced for the purchase of the GAP policy are not of the type that can be included in its purchase money security interest in Debtors' automobile.

The obligation arising out of the purchase of the GAP policy was expressly not necessary to nor required by the transaction, it is not of the same type or magnitude as the other items listed in Official Comment 3, and there is an insufficiently close nexus between acquiring the GAP policy and acquiring a new vehicle to have it constitute purchase money. That said, FMCC does hold a security interest as to those advanced funds, secured by Debtors' car, but the security interest is not a purchase money security interest and is thus not subject to the BAPCPA anti-cramdown protections of the hanging paragraph.

### C. Service Contract

The next issue is whether the funds advanced by FMCC for Debtors to acquire a service contract, or extended warranty, constitute purchase money. Debtors attached a copy of the first page of the service contract to their brief, and it clearly shows that the service contract "is not required in order to purchase, register or obtain financing for this vehicle."[18] The service contract was not included in the actual sales price of the automobile, and was instead an optional item Debtors chose to purchase, and FMCC agreed to finance, to provide protection to Debtors in the event the vehicle needed mechanical repairs after the factory warranty expired. For the same reasons articulated above regarding the GAP policy, the

---

[18] Again, the parties' stipulation is silent on the contents of the service contract. FMCC is similarly encouraged to file a motion to reconsider if the attached service contract is inaccurate.

service contract also does not fit within the type of item that falls within a purchase money obligation, as enumerated in the Official Comment to the Kansas Uniform Code.[19]

This Court acknowledges that several courts have recently held that service contracts should be included in a creditors' purchase money security interest. These courts have primarily relied upon the fact that the service contract enhances the value of the vehicle, and continues with the vehicle, similar to other options such as window tinting or undercoating.[20] But here, there is simply no evidence in this record upon which the Court could make such a finding. The stipulations, briefs by the parties, and the one page of the service contract provided all fail to indicate whether the service contract is transferable if the car is sold to a new owner, whether it increases the value of the car, etc. Although the Court could potentially be persuaded by the reasoning of those courts that have included the service contract in the creditor's purchase money security interest, neither the facts provided, nor the legal arguments raised by FMCC, are sufficient to do so in this case.[21]

---

[19]*See In re Lavigne,* 2007 WL 3469454, *12 (Bankr. E.D. Va. 2007) (holding that extended service contracts are executory in nature and the creditors do not have a purchase money security interest in them.), *aff'd in part, rev'd in part and remanded by GMAC v. Horne,* 390 B.R. 191 (E.D. Va. 2008); and *In re Mellors*,372 B.R. 763, 766 (Bankr. W.D. Pa. 2007) (holding that the portion of the loan proceeds advanced by creditor to finance a service contract on the vehicle did not constitute purchase money, but "merely a garden-variety lien.").

[20]*See, e.g. In re Macon*, 376 B.R. at 778 (holding that service contracts are part of the purchase money security interest); *In re Pajot*, 371 B.R. 139, 155 (Bankr. E.D. Va. 2007) *rev'd on other grounds GMAC v. Horne*, 390 B.R. 191 (E.D. Va. 2007) (including a service contract, but excluding GAP insurance in a purchase money security interest); and *In re Munzberg*, 388 B.R. 529, 543-44 (Bankr. D. Vt. 2008) (including service contract, but excluding GAP insurance, in a purchase money security interest).

[21]*In re Pajot,* 371 B.R. 139, 155 (Bankr E.D. Va. 2007) (holding that where "thoroughly addressed by future cases, this court may revisit the inclusion or exclusion of these components of a vehicle financing transaction in the purchase-money security interest."), *aff'd in part, rev'd in part and remanded by GMAC v. Horne,* 390 B.R. 191 (E.D. Va. 2008).

The Court, therefore, finds that, under the extremely limited facts supplied by the parties, and the essentially non-existent legal analysis on this issue provided by the creditor, that FMCC has failed to show that the service contract at issue in this case constitutes a purchase money obligation. Upon the presentation of a more comprehensive legal analysis and more complete facts, the Court may well revisit this issue in a future case.[22] However, this case has been submitted to the Court on stipulated facts, and the Court finds those facts, coupled with limited argument, are insufficient to result in a finding that this service contract is part of FMCC's purchase money security interest.

D.     Administrative Fees

The final issue before the Court is whether the "administrative fees" included in the financing provided by FMCC in association with the purchase of this automobile constitutes a purchase money obligation. The Official Comments to the UCC specifically indicate that administrative charges are among those types of charges that should be included in the "value given to enable the debtors to obtain rights in the new vehicle," and thus should be considered part of a purchase money security interest. However, Debtors here challenge whether the charge labeled as "administrative fees" in this transaction is truly the type of expense contemplated by the comments to the UCC. Debtors draw a rather unpersuasive distinction between "fees" and "charges" and dispute that the fees charged by the creditor are properly included as a purchase money obligation.

---

[22]*Id*. at 212 (noting that it is the creditor's burden to prove that charges are properly included in its purchase money security claim, and citing *In re Hayes*, 376 B.R. 655, 673 (Bankr. M.D. Tenn. 2007) and *In re Mitchell*, 379 B.R. 131, 138 (Bankr. M.D. Tenn. 2007)).

FMCC, in its response, makes no attempt to describe the nature of these fees or to persuade the Court that these particular fees are properly included. Further, the parties' stipulation is silent on what these fees covered. Instead, FMCC argues that Debtors should have to disprove that these fees are the kind of fee that should be part of its purchase money obligation, since the comment to the UCC uses the phrase "administrative charges" to describe those kinds of expenses that are typically part of the price of the vehicle. In making this argument, FMCC ignores that it is the creditor's burden to show that the charges are properly included as part of its purchase money security interest,[23] and the creditor in this case has wholly failed to carry that burden.

The Court is not, at this time, holding that administrative fees charged by this, or any other, creditor will always be excluded from the creditor's purchase money security interest. Instead, the Court merely holds that in this case, the creditor has wholly failed to establish what these fees were for, and why they constitute part of its purchase money security interest.

**D.     Effect of this ruling**

The Court finds that FMCC's objection to confirmation is overruled, to the extent it argues that the negative equity, service contract, GAP insurance and administrative fee constitute part of its purchase money obligation. Notwithstanding that holding, however, the Court finds that Debtors' plan still cannot be confirmed. Debtors' plan provides to pay $15,900, plus *Till* interest, to FMCC. However, § 1325(a) still requires that Debtors pay the

---

[23]*Id.*

13

greater of the current value of the car, or the amount still owed on the car that constitutes a purchase money security interest.

The parties stipulated that the amount owed on the car on the date of filing was $23,684.99. If one subtracts $5,668.18 (negative equity) plus $1,919.95 ( administrative fees, service contract and GAP policy) from that balance, the result is $16,096.86. Debtors must pay at least $16,096.86—and the amount may be marginally higher if the parties were to redistribute the payments made on the loan to the purchase money portion of the debt and the non-purchase money portion of the debt on some pro-rata basis. The Court requests that the parties calculate a pro-rata apportionment of all payments made on the vehicle between the purchase money obligations and the non-purchase money obligations, but it appears that in no event will that amount be less than $16,096.86. Because the amount of the purchase money security interest held by FMCC is at least $16,096.86, and the Debtors propose to pay only $15,900, the plan is not confirmable under § 1325.

Although the Court has now decided the major legal issues in this case, there remains one remaining possible factual dispute that the parties must resolve before the Court can confirm Debtors' Chapter 13 Plan. Debtors valued the car at $15,900.00 in their plan, and § 506(a)(1) only allows FMCC's secured claim to be crammed down to its value, whether it is a purchase money obligation or not. In other words, although the negative equity portion of the trade, along with the GAP insurance, service contract, and administrative fees, are not entitled to purchase money status subject to the hanging paragraph, they are still secured debts that are subject to the limitations of § 506(a)(1). FMCC thus still has a lien on the

14

vehicle "to the extent of the value of [FMCC's] interest in the estate's interest in such property."

If the value of the car is less than the purchase money security interest held by FMCC, then Debtors must pay the amount of the purchase money security interest, as detailed in this opinion. However, if the value of the car exceeds FMCC's purchase money security interest, then Debtors will be required to pay the full value of the car, up to the full amount of FMCC's claim. In that second scenario, that portion of FMCC's claim that represents the non-purchase money security interest will be subject to bifurcation under § 506(a)(1).

The parties, however, have not stipulated to the value of the car. Debtor will be given 20 days from the date of this opinion to submit an amended plan that provides payment to FMCC in an amount equal to the current value of the automobile, or the amount of FMCC's purchase money security interest, whichever is greater. The amount of the purchase money security interest will need to be recalculated by the parties to factor in today's ruling that the GAP insurance, service contract and administrative fees should be included with the negative equity as non-purchase money obligations when determining the pro-rata distribution of payments made by Debtors.

Following the filing of the amended plan, FMCC will be given the opportunity to file an objection to the plan if it believes the current value of the car is greater than the amount Debtors have proposed to pay through the plan.

**III.   CONCLUSION**

The Court finds that FMCC's objection to confirmation of Debtors' Chapter 13 plan is overruled to the extent it seeks a determination that those portions of its loan constituting negative equity, GAP insurance, service contract, and administrative fees are purchase money obligations. As to the Court's holding related to the service contract and administrative fees, that decision is largely based on the complete lack of stipulated facts and legal analysis concerning these two components of the loan, coupled with the fact that the creditor has the burden to prove its purchase money status, which burden it failed to satisfy by including sufficient facts to enable the Court to find in its favor.

The Court finds, however, that the plan cannot be confirmed as filed because it proposes to pay what Debtors contend is the value of the car, rather than the full amount of FMCC's purchase money security interest in the car, as required by the hanging paragraph after § 1325(a), which the joint stipulation suggests is at least $16,096.86. Debtors will be allowed to amend the plan to comply with the requirements of § 1325(a), as set forth herein.

**IT IS, THEREFORE, BY THE COURT ORDERED** that Ford Motor Credit Company, LLC's objection to confirmation of Debtors' Chapter 13 plan[24] is overruled to the extent it seeks a determination that the negative equity, GAP insurance, service contract, and administrative fees financed as part of the purchase of Debtors' car constitute part of its purchase money security interest.

---

[24]Doc. 26.

**IT IS FURTHER ORDERED** that confirmation of Debtors Chapter 13 plan is denied because it fails to provide for payment of Ford Motor Credit Company, LLC purchase money security interest, even after excluding the value given for the negative equity, GAP insurance, service contract and administrative fee, or the value of the collateral, whichever is greater. The amended plan in conformity with this opinion shall be filed by **December 22, 2008**, along with appropriate noticing to all creditors.

###